ROBERT A. CHAISSON, Judge.
IsThese five consolidated cases all involve the same disputes arising out of the ownership and operation of two nursing homes, Maison Orleans Partnership in Commendam and Maison Orleans II, Inc.

FACTS AND PROCEDURAL HISTORY

In 1979, Bob Dean, Sr. employed Frank Stewart, a licensed nursing home administrator, as administrator of a nursing home called Maison Orleans I, in St. Bernard Parish. As an incentive, Mr. Dean gave Mr. Stewart a 20% ownership interest in the home. This arrangement continued until the death of Bob Dean Sr. in 1986. Mr. Dean’s interests in this home devolved to his wife, Billie Dean, and his two children, Bob Dean, Jr. and Debra Dean Cook. In that same year, these latter parties, along with Mr. Stewart, reorganized the home into the Maison Orleans Partnership in Commendam (MOPIC). Mr. Stewart continued to have a 20% ownership interest in the new entity.
|Jn 1988, a second nursing home, Mai-son Orleans II, Inc. (MOII), was acquired by the Dean family in Orleans Parish. Again, Mr. Stewart was given a 20% ownership interest in this entity in return for his expertise as a consultant.
Originally, Bob Dean, Sr. formed Bob Dean Enterprises, Inc. (BDE), a corporation which managed the day to day affairs of the original Maison Orleans I. When MOPIC was formed, it continued with BDE as manager under a five-year contract. The pertinent term of that contract was that BDE was paid 7% of the gross revenues generated by the home. All of the owners of MOPIC, including Mr. Stewart, signed this contract. In 1992, the contract was renewed for another ten years on the same terms. Mr. Stewart, as administrator of MOPIC, regularly paid the monies owed to BDE under this contract. Wfiien MOII was acquired in 1988, BDE was contracted to manage its affairs, also for a fee of 7% of the gross revenues generated by the home. As a part owner and consultant to MOII, Mr. Stewart was aware of this arrangement.[1]
*3 Both of the nursing homes were originally profitable, and Mr. Stewart was paid dividends as per his ownership interests. However, Bob Dean, Jr., then president of both MOPIC and MOII, testified that because of changes in the Medicaid payment structure, maintenance requirements, and a large civil judgment against MOII, he determined that dividends would have to be terminated as of June of 1999. Mr. Stewart apparently disagreed with this decision and asked to review the books of the two nursing homes. This request was refused, and on November 24, 1999, Mr. Stewart filed the first of several suits between the parties.
Meanwhile, on June 17, 1999, Mr. Stewart submitted a letter to Bob Dean, Jr. in which he resigned his employment positions with both MOPIC and MOII, | seffective on June 30, 1999. In Mr. Dean’s view, this resignation triggered the redemption clauses of the articles of partnership of MOPIC, according to which clauses the procedures for evaluation and buyout of Mr. Stewart’s interests were set forth. Mr. Stewart disagreed that his resignation triggered these clauses, but he nonetheless complied with their terms to the extent of having appraisals made of his interests. Eventually, he rejected the values produced by the appraisers, and chose instead to litigate this issue.
Unlike MOPIC, which was a partnership in commendam, MOII was structured as a corporation. As such, the affairs of MOII at issue here were regulated by Louisiana corporate laws, more particularly La. R.S. 12:131 relating to mergers. For various reasons, including apparently the animosity between the parties, the board of directors of MOII proposed a merger plan, which was approved on January 10, 2003. As part of this plan, dissenting shareholders were to surrender their shares for a value either to be agreed upon, or as determined by a court. Because no agreement could be reached, suit was filed to ascertain the proper value of Mr. Stewart’s interest in MOII.
In addition to asserting claims for payment of his ownership interests in MOPIC and MOII, Mr. Stewart also asserted claims against Bob Dean, Jr. and BDE for return of excess management fees, as well as for the use of lines of credit available to the two nursing homes for unrelated business interests, and for various other actions asserted to have been breaches of Bob Dean, Jr.’s fiduciary duty.
Eventually, six suits were filed by the parties, and five of those were consolidated for trial here, while the sixth was dismissed. We note that during this litigation, the two nursing homes in question were destroyed by Hurricane Katrina, and neither home has ever reopened.
1 After a bench trial, a judgment was rendered in Mr. Stewart’s favor and against “Bob Dean, Jr., Maison Orleans I, and Maison Orleans II, and the entities’ respective successors and/or assigns, in solido, in the sum of $4,323,683.00, together with legal interest from the date of judicial demand, which is November 24, 1999, through date of payment and all costs of court.” This appeal followed.

LAW AND DISCUSSION

Appellants raise some forty plus assignments of error, which for convenience, this Court will treat in four broad categories: 1) issues relating to ownership and valuations of MOPIC, 2) issues relating to ownership and valuations of MOII, 3) derivative versus personal claims made by Mr. *4 Stewart, and 4) miscellaneous matters. We also note at the outset that the defendants admit that Mr. Stewart is owed the value of his ownership interests in the two homes, but they contend that the judgment does not properly fix those values. THE MOPIC CLAIMS
As noted above, MOPIC was a partnership in commendam created in 1986, by agreement of all partners. It is not disputed that this was a successor entity to Maison Orleans I, and that Mr. Stewart was given a 20% ownership interest in this prior organization as an inducement for him to manage the enterprise. His interest in MOPIC was originally this same 20%, but it increased to 21.05% when a minor owner withdrew.
Article XV of the Articles of Partnership is styled “Redemption of Certain Interests,” and provides as follows:
15.1 Events of Redemption. Upon the termination of the employment by the Partnership of Frank T. Stewart as administrator of the Nursing Home, or upon his interdiction or permanent disability for a period of six (6) months or upon the death of Frank T. Stewart or James F. McCay [a minor interest holder] (hereinafter as to each ^respective individual and his legal representative the “Terminated Partner” and each of such events the “Termination Event”), the Partnership shall purchase and the Terminated Partner (or his legal representative) and his spouse shall sell the entire rights, title and interest owned by him and his spouse (as an item of separate or community property) in and to the Partnership and the Partnership shall redeem said interest for the price and on the terms provided in this Article XV.
There is no dispute that Mr. Stewart was not fired by the partnership, but rather resigned his position as administrator. The threshold question here is whether this circumstance constitutes an “event of redemption.” The trial judge ruled that it did not. In this Court’s opinion, this was legal error on the trial court’s part.
Contracts are the law between the contracting parties. La. C.C. art. 1983. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made. La. C.C. art. 2046. Further, each provision of a contract is to be interpreted in light of all other provisions. La. C.C. art. 2050. Where the interpretation of contracts made in the district court is erroneous, the fact finding process is interdicted, and the appellate court must then make a de novo review of the record to determine which party should prevail. Chambers v. Village of Moreauville, 11-898 (La.1/24/12), 85 So.3d 593.[2]
In the present case, Article XV provides pertinently that its buy-back provisions are effective “[u]pon the termination of the employment by the Partnership of Frank T. Stewart as administrator of the Nursing Home.... ” The triggering event is thus the “termination of employment.” The following phrase, “by the Partnership of Frank T. Stewart as the administrator of the Nursing Home,” defines the employment, not the termination. *5 If the clause were only applicable if the partnership fired Mr. Stewart, it would have read “upon termination by the |¿partnership of the employment,” etc. We also note that even if there were an ambiguity in the clause itself, reference to the remainder of the article makes clear that its premise is that upon Mr. Stewart no longer serving as administrator, whether by his termination, incapacity, interdiction or death, the partnership has the right, and indeed the obligation, to purchase his ownership interest. On the other hand, there is nothing in the article which would remotely suggest that it contemplated an exception whereby its terms would not be triggered if Mr. Stewart resigned.
Having determined that the trial judge fell into legal error in not applying Article XV to this dispute, we turn to the question of what result should have been obtained by giving it effect. Article XV, Section 15.2 provides the procedure for determining the value of the terminated partner’s interest. The partnership is to employ a licensed appraiser to ascertain the value of the assets. If the terminated partner disagrees with this appraisal, he may hire his own appraiser. If the two appraisals differ by more than 10%, those two appraisers shall appoint a third appraiser. If the third appraisal is higher than the first two, the higher of the first two controls; if the third is lower than the first two, the lower of the first two controls.
The partnership employed Ross Shuf-field as its initial appraiser, and his valuation of all assets as of June 30, 1999, was $3,340,000.00, making the value of Mr. Stewart’s interest $518,790.88, as per the formula specified in Article XV, Section 15.2. Mr. Stewart disagreed with this figure and hired William Cobb, who appraised the partnership at $4,064,000.00, giving Mr. Stewart’s interest a value of $671,192.88. Because there was more than a 10% discrepancy, Mr. Cobb and Mr. Shuffield appointed Tom Cook to give a third appraisal. Mr. Cook appraised the partnership at $3,205,000.00. Because this latter figure was lower than Mr. 19Shuffield’s, in accordance with the terms of the agreement, Mr. Shuffield’s numbers became controlling. Therefore, Mr. Stewart is entitled to a payment for his interests in MOPIC of $515,790.88, plus interest from June 30, 1999, at the rate specified in Article XV, Section 15.3, which is the prime commercial rate charged by Citibank, N.A. and calculated as specified in this Section.
THE MOII CLAIMS
The next area of inquiry concerns Mr. Stewart’s interest in MOII. MOII, also a nursing home, was organized as a corporation in which Mr. Stewart was given a number of shares in return for his performing certain consulting duties. As shown above, he resigned from these duties as of June 30, 1999, but continued as a shareholder and officer of the corporation. On February 25, 2002, a majority of MOII shareholders voted to remove Mr. Stewart as a member of the board and as a director.
During this same time frame, the Dean interests decided to merge all of the nursing home entities in which they had an interest into a holding company owned solely by Bob Dean, Jr.[3] On January 10, 2003, MOII confected an Agreement and Plan of Merger in furtherance of the merger, and Mr. Stewart was informed of this proposal. On January 28, 2003, 68% *6 of MOII’s shareholders voted in favor of the merger. Mr. Stewart objected to this move and demanded $1.6 million dollars for his shares. A counter-offer of $127,994.00 was then made. Mr. Stewart declined this offer and filed suit on April 16, 2003, seeking a judicial resolution of this dispute.
The procedures to be followed in situations where dissenting shareholders object to mergers is set forth at La. R.S. 12:131. That statute provides that if agreement as to the value of a dissenting shareholder’s stock cannot be reached, L presort to the courts may be had to determine the fair cash value of that stock “as of the day before such corporate action complained of was taken.” La. R.S. 12:131(E). The issue to be decided by the court was thus the value of Mr. Stewart’s shares in MOII as of January 27, 2003, the day before the merger was approved on January 28, 2003.
At trial, Mr. Stewart presented the opinion of Lawrence Cramer, CPA, as to the various amounts which he deemed were owed to Mr. Stewart by MOPIC and MOII. In his judgment, the trial judge used Mr. Cramer’s figures for both of these claims and added them together to arrive at the total judgment. We have previously addressed the legal errors which rendered Mr. Cramer’s determination of value for the MOPIC claim irrelevant. For the following reasons, we find Mr. Cramer’s opinions as to the value of Mr. Stewart’s MOII shares similarly irrelevant.
The issue to be determined by the court in regard to MOII was simply the value of Mr. Stewart’s shares as of January 27, 2003. Mr. Cramer’s report asserts values for Mr. Stewart’s claims against MOII as of December 31, 1999, and then projects those amounts forward to 2013. These figures are irrelevant to the question of the value of Mr. Stewart’s shares as of January 27, 2003, and therefore are not relevant to the issue to be determined. Again, the trial judge legally erred in using Mr. Cramer’s irrelevant valuations as a basis for the judgment. Therefore, we must now undertake a de novo review to determine the proper value of Mr. Stewart’s shares in MOII. Chambers v. City of Moreauville, supra.
The defendants for their part presented the expert testimony of G. Christopher Louis, a senior member of the American Society of Appraisers (ASA) and a designated Member of the Appraisal Institute (MAI). Mr. Louis presented a comprehensive appraisal of MOII, as well as the value of Mr. Stewart’s shares, as |nof January 27, 2003, the date mandated by operation of La. R.S. 12:131. He arrived at a value of $406,000.00,[4] as of the appropriate date. He then reduced this amount by a marketability discount of 35%, and further reduced it by a minority ownership discount of 25.9%. His ultimate conclusion was that Mr. Stewart’s 30.77% interest in the corporation was worth $57,700.00.[5] While we find that the $406,000.00 figure was established, we disagree that any discounts should have been applied. The case of Cannon v. Bertrand, 08-1073 (La.1/21/09), 2 So.3d 393, is similar to the *7 present action, in that majority shareholders were buying out a minority shareholder. The court declined to apply a marketability discount because the majority wanted to acquire the shares, and thus this factor had no applicability. It also declined to apply a minority shareholder discount because this factor actually involves the lack of control existing on the part of the minority party. Because the buyers were the majority shareholders who already had control, control was also a non-issue. We are unable to distinguish these rulings from the facts before us, and therefore conclude that it was error to apply either discount. Because Mr. Stewart’s shares constituted 30.77% of the outstanding shares, his interest on January 27, 2003, was $124,926.20 ($406,000.00 x 30.77%). He is therefore entitled to this amount, with judicial interest from January 27, 2003.
THE DERIVITIVE CLAIMS
Mr. Stewart contended at trial that various activities of Bob Dean, Jr. damaged him personally. Two areas which were asserted at trial were that Bob Dean, Jr. had used a line of credit available to the two nursing homes at issue for personal purposes and had managed them in such a manner as to reduce their |1gvalue, and that these actions amounted to a breach of fiduciary duty. A third claim was that BDE, the nursing home management company, had overcharged the nursing homes by collecting a 7% management fee, thus causing a further diminution in their value. There were also claims that Mr. Dean charged the nursing homes excessive fees for storage of supplies at separately owned warehouses, as well as similar excess fees for use of his separately owned hotels.
The first two claims involving the misuse of the line of credit and general mismanagement have already been extensively litigated and have resulted in two appellate court opinions adverse to Mr. Stewart’s position. In Cook v. Hibernia Nat. Bank, 01-455 (La.App. 4 Cir. 4/10/02), 816 So.2d 901, and Cook v. Hibernia Nat. Bank, 03-330 (La.App. 4 Cir. 2/18/04), 869 So.2d 176, the courts discussed in detail the facts underlying Mr. Stewart’s claims arising from the Hibernia Bank line of credit and alleged mismanagement by Bob Dean, Jr., all of which actions allegedly amounted to breach of fiduciary duty. Those details need not be repeated here. It is sufficient to note that both opinions held unequivocally that all of the allegations involving the line of credit and mismanagement were derivative claims of MOPIC and MOII, and not claims personal to Mr. Stewart. As such, he had no personal right of action as to these matters. We also note that as to the derivative claims involving MOII, when Mr. Stewart opted to trigger the applicability of La. R.S. 12:131, he gave up all rights to assert any claims, including derivative ones, as to that corporation. Armand v. McCall, 570 So.2d 158 (La.App. 3rd Cir.1990), writ denied, 575 So.2d 375 (La.1991). Similarly, when he resigned from MOPIC, his interests in that entity ceased, and there could be no future obligations of that partnership to him after that date.
Both of the Cook opinions pointed out that the key factor in their analysis was that the damages claimed for these items fell equally upon all partners of |13MOPIC and all shareholders of MOII. This analysis is likewise applicable to Mr. Stewart’s claims involving the services of BDE, and the rental of hotel and warehouse space. Since these charges fell on the nursing home entities, these are also derivative claims for which Mr. Stewart has no personal right of action. We therefore sustain the defendants’ exception of no right *8 of action as to these claims and dismiss Mr. Stewart’s personal assertions of them.
MISCELLANEOUS CLAIMS
Mr. Stewart and the defendants entered into a lengthy pre-trial order which delineated the issues that would be tried. During trial, and again on appeal, Mr. Stewart has asserted several claims, which cannot be found in the pre-trial order. He complains that he was denied the right to acquire Billie Dean’s shares in various entities, denied the right to object to the settlement of the Cook v. Hibernia Bank lawsuit, and that there was an issue concerning a key-man insurance policy. None of these matters are mentioned in the pretrial order.
Mr. Stewart also spends a great deal of effort in pointing to the insurance proceeds paid tó the nursing homes after Hurricane Katrina. These matters are irrelevant to the issues before us, because they took place years after Mr. Stewart ceased to have any interests in those entities.
There are errors asserted by the defendants that also need not be addressed because of our resolution of the case. Key among these is the apparently correct assertion that the judgment was erroneous because it awarded interest that had been calculated twice. However, because we have already set aside that judgment, we need not address this issue further.

CONCLUSION

For the foregoing reasons, the judgment of the district court is vacated, and judgment is entered by this Court as follows: it is ordered that there be judgment in 1 ufavor of Frank T. Stewart and against Maison Orleans Partnership in Commen-dam in the amount of $515,790.88, with interest as specified in Article XV, Section 15.3, of the MOPIC partnership agreement from July 30, 1999, until paid; it is further ordered that there be judgment in favor of Frank T. Stewart and against Maison Orleans II, Inc. in the amount of $124,926.20, with judicial interest from January 27, 2003, until paid. All claims by Frank Stewart against Bob G. Dean, Jr. are hereby dismissed with prejudice, and all claims by Bob Dean, Jr., Maison Orleans Partnership in Commendam and Maison Orleans II, Inc. against Frank Stewart are likewise dismissed with prejudice.[6] All parties to bear their own costs of this appeal.

VACATED AND RENDERED.

. Also in regard to the 7% fee, it is instructive to note that in May of 1999, Mr. Stewart independently bought St. Francisville Manor, a nursing home. In conjunction with that acquisition, he established Fleur de Lis Healthcare Management, L.L.C., and St. *3 Francisville Manor agreed to pay this company a management fee of 7% of its gross revenues.

. Because of the trial court’s ruling that Article XV was not applicable, he looked to the expert testimony of Lawrence Cramer, CPA, for valuations of Mr. Stewart’s claims arising from his dealings with MOPIC ($2,316,-922.00) and MOII ($2,006,761.00), and entered judgment for $4,323,683.00, the total of these two figures. Because Article XV is applicable here, and because Mr. Cramer was never a part of the contractually mandated process for fixing the amount due Mr. Stewart under the contract, his opinion as to the values related to MOPIC is irrelevant here.

. It was established at trial that the Dean family had interests in eight nursing homes, two of which were MOPIC and MOII.

. This figure included $155,000.00 in loans to unspecified stockholders and members. Although the amount of $91,165 is in several places in the record asserted to be Mr. Stewart’s indebtedness to the corporation, there is no evidence presented in the record to corroborate this, nor is there any satisfactory explanation of how this indebtedness arose. We therefore decline to consider it in our ultimate awards in this case.

. Mr. Stewart originally owned 20% of the stock in this corporation, but when the corporation redeemed various shares, his percentage of ownership increased to 30.77%.

. The original judgment entered by the district court recited that the judgment was also against ‘‘[MOPIC's and MOII's] respective successors and assigns." The pleadings were never amended to name any other parties defendant, and therefore no judgment may be entered against any such non-parties.